John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Tel: (858) 209-6941
jnelson@milberg.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

RATIB HABBAL, RUSHDA AFZAL, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

POWERSCHOOL HOLDINGS, INC.,

Respondent/Defendant

Case No.:

**CLASS ACTION COMPLAINT FOR:**

**(1) Negligence;**
**(2) Negligence *Per Se*;**
**(3) Unjust Enrichment;**
**(4) Breach of Third-Party Beneficiary Contract;**
**(5) Breach of Fiduciary Duty; and**
**(6) Declaratory Judgment and Injunctive Relief**

**JURY TRIAL DEMANDED**

Plaintiffs Ratib Habbal and Rushda Afzal ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class" or "Class Members"), bring this Class Action Complaint ("Complaint") against Defendant PowerSchool Holdings, Inc. ("PowerSchool"). The allegations set forth in this Complaint are based on the personal knowledge of Plaintiffs and upon information and belief and further investigation of counsel.

## I. NATURE OF THE ACTION

1. This is a data breach class action against Defendant for failure to adequately secure and safeguard Plaintiffs' and the Class's confidential and sensitive information held throughout the typical course of business.

2. PowerSchool provides cloud-based software services for those involved in the K-12 education process throughout the United States, providing software services to tens of thousands of customers, which consists of school districts and other education-related entities, which, in turn, use PowerSchool's software to support millions of students and their families.

3. According to Defendant, on or about December 28, 2024, Defendant became aware that an unauthorized actor gained access to PowerSchool's network through unauthorized access to certain information throughout one of its customer support portals, PowerSource.

4. According to Defendant, an unauthorized user gained access to certain PowerSchool Student Information System ("SIS") customer data using compromised credentials, and in doing so, the Class's data was accessed (the "Data Breach").

5. Class Members received notice of the Data Breach from their respective educational institutions, which had contracted with PowerSchool to provide software services.

6. Upon information and belief, thousands, if not millions, of individuals' information was affected by the Data Breach, including that of minors. The information exposed or otherwise accessed by an unauthorized third-party in the Data Breach included Plaintiffs' and the Class Member's names and addresses, and, upon information and belief, private student and educational information, medical information, and Social Security numbers ("SSN"s).[1] Collectively, the information described in this paragraph shall be referred to as "PII" (Personally Identifiable Information) or "Private Information" throughout this Complaint.

7. Upon learning of the suspected Data Breach on or about December 28, 2024, according to Defendant, an investigation was conducted. Defendant, so far, has yet to inform affected individuals if the investigation was completed or the complete extent of the Data Breach.

---

[1] *See* Exhibit 1, Cybersecurity Incident Involving PowerSchool Dated January 10, 2025, received by Plaintiffs (effectively known as "The Notice" or "Notice").

8. On January 10, 2025, Plaintiffs received Notice from their school, Crescent Academy International. *See* Ex. 1. It stated that: "On Tuesday, January 7, 2025, PowerSchool informed our leadership team that they experienced a cybersecurity incident involving unauthorized access to certain PowerSchool SIS customer data. Unfortunately, they have confirmed that the information may belong to some of Crescent's families and educators." *Id.*

9. Defendant had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on its affirmative representations to Plaintiffs and the Class, to keep their PII confidential, safe, secure, and protected from unauthorized disclosure or access.

10. Plaintiffs and the Class have taken reasonable steps to maintain the confidentiality and security of their PII.

11. Plaintiffs and the Class reasonably expected Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

12. Defendant, however, breached its numerous duties and obligations by failing to implement and maintain reasonable safeguards; failing to comply with industry-standard data security practices and federal and state laws and regulations governing data security; failing to properly train its employees on data security measures and protocols; failing to timely recognize and detect unauthorized third parties accessing its system and that substantial amounts of data had been compromised; and failing to timely notify the impacted Class.

13. In this day and age of regular and consistent data security attacks and data breaches, and given the sensitivity of the data entrusted to Defendant, this Data Breach is particularly egregious and foreseeable.

14. By implementing and maintaining reasonable safeguards and complying with standard data security practices, Defendant could have prevented this Data Breach.

15. Plaintiffs and the Class are now faced with a present and imminent lifetime risk of identity theft or fraud. These risks are made more substantial, and significant because of the inclusion of, upon information and belief, their SSN and other static PII.

16. PII has great value to cyber criminals, especially an individuals' SSN. As a direct cause of Defendant's Data Breach, Plaintiffs' and the Class's PII is in the hands of cyber-criminals and may be available for sale on the dark web for other criminals to access and abuse at the expense of Plaintiffs and the Class.

17. The Notice acknowledges the imminent threat that the Data Breach has caused to Plaintiffs.

18. The modern cyber-criminal can use the PII and other information stolen in cyber-attacks to assume a victim's identity when carrying out crimes such as:

a. Obtaining and using a victim's credit history;

b. Making financial transactions on their behalf and without their knowledge or consent, including opening credit accounts in their name or taking out loans;

c. Impersonating them in written communications, including mail, e-mail, and/or text messaging;

d. Stealing, applying for, and/or using benefits intended for the victim;

e. Committing illegal acts while impersonating their victim which, in turn, could incriminate the victim and lead to other legal ramifications.

19. Plaintiffs' and Class Members' PII was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect Plaintiffs' and Class Members' PII. Defendant failed to prevent the Data Breach, and, after discovering the Data Breach in December 2023,

have yet to notify affected individuals, such as Plaintiffs and members of the Class, of the extent and nature of the Data Breach.

20. As a result of Defendant's inadequate response to the Data Breach, the PII of Plaintiffs and the Class has been compromised, and they are at significant and imminent risk of identity theft, fraud, and various other forms of personal, social, and financial harm, but they are not fully informed as to the extent of the Data Breach. The risk will persist because of Defendant's negligence.

21. Plaintiffs bring this action on behalf of all persons whose PII was compromised in the Data Breach as a direct consequence for Defendant's failure to:

a. adequately protect consumers' PII entrusted to it;

b. warn its current and former customers of their inadequate information security practices; and

c. effectively monitor their websites and platforms for security vulnerabilities and incidents.

22. Defendant's conduct amounts to negligence and violates federal and state statutes and guidelines.

23. As a result of the Data Breach, Plaintiffs and the Class suffered ascertainable losses, including but not limited to:

a. the invasion of privacy;

b. the compromise, disclosure, theft, and imminent unauthorized use of Plaintiffs' and the Class's PII;

c. emotional distress, fear, anxiety, nuisance, and annoyance related to the theft and compromise of their PII;

d. lost or diminished inherent value of PII; out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time or wages;

e. the continued and increased risk to their PII, which, (a) remains available on the dark web for individuals to access and abuse; and (b) remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and the Class.

24. Plaintiffs seeks to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose PII was compromised and stolen as a result of the Data Breach and remains at risk due to inadequate data security practices employed by Defendant.

25. Accordingly, Plaintiffs, on behalf of themselves and the Class, assert claims for Negligence, Negligence *Per Se*, Unjust Enrichment, Breach of Fiduciary Duty, and Breach of Third-Party Beneficiary Contract. Plaintiffs seek injunctive relief, declaratory relief, monetary damages, and all other relief as authorized in equity by law, or any other relief the Court deems just and appropriate.

## II. PARTIES

26. Plaintiff Ratib Habbal is, and at all relevant times was, a citizen of Canton, Michigan. Plaintiff Habbal has a child who, at the time of the filing of this Complaint, attends Crescent Academy International.

27. Plaintiff Rushda Afzal is, and at all relevant times was, a citizen of Canton, Michigan. Plaintiff Afzal has three children who, at the time of the filing of this Complaint, attend Crescent Academy International.

28. PowerSchool is the leading provider of cloud-based software in North America.[2]

29. PowerSchool provides software to schools and entire school districts, and, in doing so, this software is utilized by educators and students in their schools. PowerSchool provides customer

[2] https://www.powerschool.com/company/ (last viewed Jan. 12, 2025).

technology solutions to highly regulated organizations, and it enhances the digitization of the educational process.[3]

30. Upon information and belief, PowerSchool is a Delaware corporation with its principal place of business at 150 Parkshore Dr., Folsom, California 95630.

31. PowerSchool's privacy policy provides that, among other things, "We use state-of-the-art, and appropriate physical, technical, and administrative security measures to protect the personal data that we process[,]" and that when using service providers for personal data, "we always enter into a Data Processing Agreement with all of our service providers – imposing a duty on them to process the personal data we have transferred to them securely including when they store or process the personal data in another location/jurisdiction."[4]

32. By obtaining, collecting, using, and deriving benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties to those persons, and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from unauthorized disclosure and/or criminal cyber activity that would lead to readily foreseeable harm to Plaintiffs and the Class.

## III. JURISDICTION AND VENUE

33. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), *et seq*. The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 members in the proposed Class, and at least one member of the Class is a citizen of a state different from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

34. This Court has personal jurisdiction over Defendant because PowerSchool is headquartered in and conducts substantial business in this District.

[3] *Id.*
[4] https://www.powerschool.com/privacy/ (last viewed Jan. 12, 2025).

35. Venue is proper in this Court under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District, and PowerSchool is headquartered within this judicial district.

## IV. FACTUAL ALLEGATIONS

### A. Background

36. In the ordinary course of its business practices, Defendant stores, maintains, and uses an individuals' PII, which includes that of Plaintiffs and Class Members, including but not limited to information such as:

a. Full names;
b. Personal home address;
c. Student Information; and
d. SSN.

37. Defendant understands the importance of securely storing and maintaining PII.

### B. The Data Breach

38. Defendant became aware of the Data Breach on or about December 28, 2024.[5]

39. Defendant then took steps to investigate the matter further but neglected to notify affected individuals of the full nature of the Data Breach.

40. The details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures taken by Defendant to ensure a data breach does not occur again, have not been shared with regulators, Plaintiffs, or members of the Class.

### C. Defendant Was Aware of the Data Breach Risks

41. Considering numerous high-profile data breaches in the educational industry, Defendant knew or should have known that electronic records that they maintain would be targeted by cybercriminals.

[5] *See* Exhibit 1.

42. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

43. Defendant had and continues to have obligations created by implied contract, industry standards, common law, and representations made to Plaintiffs and the Class, to keep their PII private and confidential and to protect it from unauthorized access, disclosure, or exfiltration.

44. The PII of Plaintiffs and the Class was provided to Defendant with the reasonable expectation that, any entity such as Defendant, which is responsible for maintaining such data, would comply with their obligations to employ reasonable care to keep such information confidential and secure from unauthorized access.

45. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and data breaches in the educational industry preceding the date of the Data Breach, and particularly considering Defendant's role in that industry as the leading provider of software services.

46. Indeed, data breaches, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known and foreseeable to the public and to anyone in Defendant's industry, including Defendant.

47. According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take substantial time, money, and patience to

resolve.[6] Identity thieves use the stolen PII for a variety of crimes, including but not limited to, credit card fraud, telephone or utilities fraud, and bank and finance fraud.[7]

48. The PII of Plaintiffs and the Class were accessed and taken by cyber criminals for the very purpose of engaging in illegal and unethical conduct, including crimes involving identity theft, fraud, or to otherwise profit by selling their data to other criminals who purchase PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

49. Defendant knew, or reasonably should have known, of the critical importance of safeguarding Plaintiffs' and Class Members' PII, including their SSN. Defendant also knew, or should have known, the foreseeable consequences of a breach in their data security systems, which would specifically lead to significant costs and damages for the Plaintiffs and the Class.

50. Plaintiffs and the Class now face years of constant monitoring and surveillance of their Private Information. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII as a direct result of the Data Breach.

51. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's own failure to install, implement, or maintain adequate data security measures, software and other industry best practices for safeguarding the PII of Plaintiffs and the Class.

---

[6] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf (last visited Jan. 12, 2025).

[7] *Id*. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

**D. Defendant Failed to Comply with FTC Guidelines**

52. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable and adequate data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

53. In 2022, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[8]

54. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

55. The FTC has brought enforcement actions against businesses for failing to protect consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

---

[8] Ritchie, J. N. & A., & Jayanti, S.F.-T. and A. (April 26, 2022). *Protecting personal information: A guide for business.* Federal Trade Commission. https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Jan. 12, 2025).

Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

56. Defendant failed to properly implement basic data security practices, and its failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

57. To prevent and detect cyber-attacks, including the cyber-attack on Defendant's network that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government and FTC, the following measures:

a. Implement an awareness and training program, because end users are targets, employees and individuals should be aware of the threat of malware and how it is delivered;

b. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing;

c. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users;

d. Configure firewalls to block access to known malicious IP addresses;

e. Patch operating systems, software, and firmware on devices using a centralized patch management system;

f. Set anti-virus and anti-malware programs to automatically conduct regular scans and/or repairs;

g. Create and manage the use of privileged accounts based on the varying level of accessibility using a principle of least privilege wherein no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary, such as any internal IT employees;

h. Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares;

i. Disable macro scripts from Microsoft Office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications;

j. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common malware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder;

k. Consider disabling Remote Desktop protocol (RDP) if it is not being used;

l. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy;

m. Execute operating system environments or specific programs in a virtualized environment; and

n. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

58. Defendant was at all times fully aware of its obligation to protect the PII of its customers, clients' customers, and prospective customers. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**E. Defendant Failed to Comply with Industry Standards**

59. A number of industry and national best practices have been published and should have been used as a go-to resource and authoritative guide when developing Defendant's cybersecurity practices. Best cybersecurity practices that are standard in the financial services industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points of security.

60. Upon information and belief, Defendant failed to meet the minimum standards of the following cybersecurity frameworks: the NIST Cybersecurity Framework Version 1.1 (including

without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established standards in reasonable cybersecurity readiness. These frameworks are existing and applicable industry standards in Defendant's industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber-attack and causing the Data Breach.

61. The occurrence of the Data Breach is indicative that Defendant failed to adequately implement one or more of the above measures to prevent or circumvent ransomware attacks or other forms of malicious cybercrimes, resulting in the Data Breach.

**F. PII Holds Value to Cyber Criminals**

62. Businesses, such as Defendant, that store PII in their daily course of business are more likely to be targeted by cyber criminals. Credit card, routing, bank account and other financial numbers are highly sought data targets for hackers, but information such as date of birth, driver's license number, and SSN are even more desirable to cyber criminals; they are not easily destroyed or replaceable and can be easily used to perpetrate acts of identity theft and other types of fraud.

63. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web to obtain PII of other unknown individuals. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and banking details have a price range of $50 to $200.[9]

64. A person's SSN, for example, is among the worst kind of PII to have stolen or otherwise compromised because they may be put to a variety of fraudulent uses and are difficult for an individual

[9] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Jan. 12, 2025).

to change or otherwise repair once it's compromised. The Social Security Administration ("SSA") stresses that the loss of an individual's SSN, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems. [10]

65. What is more, it is no easy task to change or cancel a stolen or compromised SSN as is the case for several of the Class Members in this action. An individual cannot obtain a new SSN without significant time, monetary investment, paperwork, and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of an SSN is not permitted and the only form of remediation happens *after* the first incident of misuse; an individual must show evidence of actual, ongoing fraudulent activity to be eligible to submit an application requesting a new SSN with the SSA.

66. Furthermore, as the SSA warns:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

---

[10] *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Jan. 12, 2025).

> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[11]

67. Here, the unauthorized access by cyber criminals left them with the tools to perform the most thorough identity theft—they have obtained enough of the essential PII that can be used to mimic the identity of the victim. The PII of Plaintiffs and the Class stolen in the Data Breach constitutes a dream for hackers or cyber criminals and a nightmare for Plaintiffs and the Class. Stolen personal data of Plaintiffs and the Class represents essentially one-stop shopping for identity thieves indefinitely.

68. The FTC has released its updated publication on protecting PII for businesses, which includes instructions on protecting PII, properly disposing of PII, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

69. General policy reasons support such an approach. A person whose personal information has been compromised may not see any signs of identity theft for years. According to the United States Government Accountability Office ("GAO") Report to Congressional Requesters:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[12]

70. Companies recognize that PII is a valuable asset and a valuable commodity, but also necessary throughout the typical course of business with consumers. A "cyber black-market" exists in

---

[11] *Id.*

[12] *See* https://www.gao.gov/assets/gao-07-737.pdf (June 2007) at 29.

which criminals openly post stolen SSN and other PII on several dark web Internet websites. The stolen PII of Plaintiffs and the Class has a high value on both legitimate and black markets.

71. Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent tax refund or fraudulent unemployment benefits. The United States government and privacy experts acknowledge that it may take years for identity theft to come to light and be detected.

72. As noted above, the disclosure of SSN in particular poses a significant risk. Criminals can, for example, use SSNs to create false bank accounts or file fraudulent tax returns or other tax related forms and documents using an alias of their victim. Class Members whose SSN have been compromised in the Data Breach now face a real, present, imminent, and substantial risk of identity theft and other problems associated with the disclosure of their SSN and will need to monitor their credit and tax filings for an indefinite duration.

73. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, merely losing payment information in a retailer data breach, because those victims can file disputes, cancel or close credit and debit cards and/or accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not nearly impossible, to change.

74. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[13]

---

[13] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

75. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police or other emergency medical services. An individual may not know that their driver's license was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud, or until the individual attempts to lawfully apply for unemployment and is denied benefits (due to the prior, fraudulent application and award of benefits).

**G. Plaintiffs' and Class Members' Damages**

76. Defendant has failed to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and the Class's PII.

77. Plaintiffs and the Class have been damaged by the compromise of their PII in the Data Breach.

78. Plaintiffs and the Class presently face substantial risk of out-of-pocket fraud losses such as loans opened in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

79. Plaintiffs and the Class have been, and currently face substantial risk of being targeted now and in the future, for phishing schemes, data intrusion, and other illegality based on their PII being compromised in the Data Breach as potential fraudsters could use the information garnered to target such schemes more effectively against Plaintiffs and the Class.

80. Plaintiffs and the Class may also incur out-of-pocket costs for implementing protective measures such as purchasing credit monitoring fees, credit report fees, credit freeze fees, and other similar costs directly or indirectly related to the Data Breach.

81. Plaintiffs and the Class also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in data breach cases.

82. Plaintiffs and the Class have spent and will continue to spend significant amounts of uncompensated time to monitor their financial accounts, sensitive information, credit score, and records for misuse.

83. Plaintiffs and the Class have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach

84. Moreover, Plaintiffs and the Class have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of proper and adequate security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online and that access to such data is password protected.

85. Further, because of Defendant's conduct, Plaintiffs and the Class are forced to live with the anxiety and fear that their PII—which contains the most intimate details about a person's life—may be disclosed to the entire world, whether physically or virtually, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

86. As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and the Class have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm because of the Data Breach.

**1. Plaintiff Ratib Habbal's Experience**

87. Plaintiff Habbal has a child who, at the time of the filing of this Complaint, attends Crescent Academy International.

88. Plaintiff Habbal entrusted his PII and that of his family along with confidential information to PowerSchool, through his school, with the reasonable expectation and understanding that PowerSchool and/or its agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify they of any data security incidents related to his PII. Plaintiff Habbal would not have allowed PowerSchool to collect and maintain his PII had he known that it would not take reasonable steps to safeguard his PII and that of his family.

89. Plaintiff Habbal received the Notice of Data Breach on or about January 10, 2025.

90. The Notice Letter sent by Crescent Academy International advised Plaintiff Habbal that PowerSchool confirmed that there was unauthorized access to personal information belonging to some of Crescent's families and educators contained in the Student Information System maintained by PowerSchool.[14]

91. This information included student contact information, names, addresses, and other data elements.[15]

92. Plaintiff Habbal has been forced to spend time dealing with and responding to the direct consequences of the Data Breach, which include spending time on the telephone calls, researching the Data Breach, verifying the authenticity of the Notice, exploring credit monitoring and identity theft insurance options, and self-monitoring his accounts. This is uncompensated time that has been lost forever and cannot be recaptured.

---

[14] *See* Exhibit 1.
[15] *Id.*

93. Since learning about the breach, Plaintiff Habbal has taken the necessary preventative measures in an effort to mitigate the risk of any potential instances of identity theft of fraud, to review financial statements and identity theft protection reports to preemptively detect and deter actual instances of identity theft or fraud, and plans to continue to so for the foreseeable future.

94. Prior to this Data Breach, Plaintiff Habbal had taken steps to protect and safeguard his PII, including monitoring his PII closely. He has not knowingly transmitted his PII over unsecured or unencrypted internet connections. Plaintiff Habbal stores all documents containing his PII in a safe and secure location. Moreover, he diligently chooses unique usernames and passwords for the online accounts that he has.

95. Plaintiff Habbal has suffered actual injury in the form of damages to, and diminution in, the value of his PII – a form of intangible property that Plaintiff Habbal entrusted to Defendant. This PII was compromised in, and has been diminished as a result of, the Data Breach.

96. Plaintiff Habbal has also suffered actual injury in the forms of lost time and opportunity costs, annoyance, interference, and inconvenience as a result of the Data Breach, and has anxiety and increased concerns due to the loss of his privacy and the substantial risk of fraud and identity theft which he now faces.

97. Plaintiff Habbal has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of his PII resulting from the compromise of his PII, especially his SSN, in combination with his name, which, upon information and belief, is now in the hands of cyber criminals and other unauthorized third parties.

98. Knowing that thieves stole his PII, including the potential theft of his SSN, and knowing that his PII will likely be sold on the dark web, has caused Plaintiff Habbal great anxiety.

99. Additionally, Plaintiff Habbal does not recall having been involved in any other data breaches in which his sensitive and confidential PII, such as his SSN, was compromised.

100. Plaintiff Habbal has a continuing interest in ensuring that his PII which, upon information and belief, remains in the possession of PowerSchool, is protected, and safeguarded from future data breaches.

101. As a result of the Data Breach, Plaintiff Habbal is presently and will continue to be at a present and heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come.

**2. Plaintiff Rushda Afzal's Experience**

102. Plaintiff Afzal has three children who, at the time of the filing of this Complaint, attend Crescent Academy International.

103. Plaintiff Afzal entrusted her PII and that of her family along with confidential information to PowerSchool, through his school, with the reasonable expectation and understanding that PowerSchool and/or its agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify they of any data security incidents related to her PII. Plaintiff Afzal would not have allowed PowerSchool to collect and maintain her PII had she known that it would not take reasonable steps to safeguard her PII and that of her family.

104. Plaintiff Afzal received the Notice of Data Breach on or about January 10, 2025.

105. The Notice Letter sent by Crescent Academy International advised Plaintiff Afzal that PowerSchool confirmed that there was unauthorized access to personal information belonging to some

of Crescent's families and educators contained in the Student Information System maintained by PowerSchool.[16]

106. This information included student contact information, names, addresses, and other data elements.[17]

107. Plaintiff Afzal has been forced to spend time dealing with and responding to the direct consequences of the Data Breach, which include spending time on the telephone calls, researching the Data Breach, verifying the authenticity of the Notice, exploring credit monitoring and identity theft insurance options, and self-monitoring her accounts. This is uncompensated time that has been lost forever and cannot be recaptured.

108. Since learning about the breach, Plaintiff Afzal has taken the necessary preventative measures in an effort to mitigate the risk of any potential instances of identity theft of fraud, to review financial statements and identity theft protection reports to preemptively detect and deter actual instances of identity theft or fraud, and plans to continue to so for the foreseeable future.

109. Prior to this Data Breach, Plaintiff Afzal had taken steps to protect and safeguard her PII, including monitoring her PII closely. She has not knowingly transmitted her PII over unsecured or unencrypted internet connections. Plaintiff Afzal stores all documents containing her PII in a safe and secure location. Moreover, she diligently chooses unique usernames and passwords for the online accounts that she has.

110. Plaintiff Afzal has suffered actual injury in the form of damages to, and diminution in, the value of her PII – a form of intangible property that Plaintiff Afzal entrusted to Defendant. This PII was compromised in, and has been diminished as a result of, the Data Breach.

---

[16] *See* Exhibit 1.
[17] *Id.*

111. Plaintiff Afzal has also suffered actual injury in the forms of lost time and opportunity costs, annoyance, interference, and inconvenience as a result of the Data Breach, and has anxiety and increased concerns due to the loss of her privacy and the substantial risk of fraud and identity theft which she now faces.

112. Plaintiff Afzal has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of her PII resulting from the compromise of her PII, especially her SSN, in combination with her name, which is now, upon information and belief, in the hands of cyber criminals and other unauthorized third parties.

113. Knowing that thieves stole her PII, including the potential theft of her SSN, and knowing that her PII will likely be sold on the dark web, has caused Plaintiff Afzal great anxiety.

114. Additionally, Plaintiff Afzal does not recall having been involved in any other data breaches in which her sensitive and confidential PII, such as her SSN, was compromised.

115. Plaintiff Afzal has a continuing interest in ensuring that her PII which, upon information and belief, remains in the possession of PowerSchool, is protected, and safeguarded from future data breaches.

116. As a result of the Data Breach, Plaintiff Afzal is presently and will continue to be at a present and heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come.

## V. CLASS ACTION ALLEGATIONS

117. Plaintiffs bring this nationwide class action according to Federal Rules of Civil Procedure, Rules 23(b)(2), 23(b)(3), and 23(c)(4).

118. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All persons residing in the United States whose PII was compromised during the Data Breach that is the subject of a Notice ("Class").

119. Excluded from the Class are: (i) Defendant and its employees, officers, directors, affiliates, parents, subsidiaries, and any entity in which a Defendant has a whole or partial ownership of financial interest; (ii) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (iii) any counsel and their respective staff appearing in this matter; and (iv) all judges assigned to hear any aspect of this litigation, their immediate family members, and their respective court staff.

120. Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

121. **Numerosity**. The Class is so numerous that joinder of all members is impracticable. The Class likely includes at least thousands, if not millions, of individuals whose personal data was compromised by the Data Breach. The exact number of Class Members is in the possession and control of Defendant and will be ascertainable through discovery.

122. **Commonality.** There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any questions that may affect only individual Class Members, including, without limitation:

a. Whether Defendant unlawfully maintained, lost or disclosed Plaintiffs' and the Class's PII;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Class to safeguard their PII;

f. Whether Defendant breached duties to Class to safeguard their PII;

g. Whether cyber criminals obtained the Class's PII in the Data Breach;

h. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i. Whether Defendant owed a duty to provide Plaintiffs and Class timely notice of this Data Breach, and whether Defendant breached that duty;

j. Whether Plaintiffs and Class suffered legally cognizable damages as a result of Defendant's misconduct;

k. Whether Defendant's conduct was negligent;

l. Whether Defendant's conduct violated federal law;

m. Whether Defendant's conduct violated state law; and

n. Whether Plaintiffs and Class are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

123. **Typicality**. Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all proposed Class Members, had their PII compromised, breached, or otherwise stolen in the Data Breach. Plaintiffs and the Class were injured through the uniform misconduct of Defendant, described throughout this Complaint, and assert the same claims for relief.

124. **Adequacy**. Plaintiffs and counsel will fairly and adequately protect the interests of Plaintiffs and the proposed Class. Plaintiffs retained counsel who are experienced in Class action and complex litigation, particularly those involving Data Breach, as is at issue in this Complaint. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of other Class Members.

125. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Moreover, absent a class action, most Class Members would find the cost of litigating their claims prohibitively high and would therefore have

no effective remedy, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class. Plaintiffs and the Class have been harmed by Defendant's wrongful conduct and/or action. Litigating this action as a class action will reduce the possibility of repetitious litigation relating to Defendant's conduct and/or inaction. Plaintiffs know of no difficulties that would be encountered in this litigation that would preclude its maintenance as a class action.

126. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A), in that the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action conserves judicial resources and the parties' resources and protects the rights of each member of the Class. Specifically, injunctive relief could be entered in multiple cases, but the ordered relief may vary, causing Defendant to have to choose between differing means of upgrading data security infrastructure and choosing the court order with which to comply. Class action status is also warranted because prosecution of separate actions by Class Members would create the risk of adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

127. Class certification, therefore, is appropriate under Rule 23(a) and (b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

128. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the

disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty or obligation to Plaintiffs and the Class to exercise due care in collecting, storing, using, safeguarding, or otherwise maintaining their PII;

b. Whether Defendant breached a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, using, safeguarding, or otherwise maintaining their PII;

c. Whether Defendant failed to comply with their own policies or procedures and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

e. Whether Plaintiffs and the Class are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

## VI. CAUSES OF ACTION

### COUNT I
### Negligence

129. Plaintiffs and the Class reallege and incorporate all foregoing paragraphs.

130. Plaintiffs and the Class, through their educational institutions, clients of PowerSchool, entrusted PowerSchool with their PII.

131. Plaintiffs and the Class entrusted their PII to PowerSchool on the premise and with the understanding that PowerSchool would safeguard their information, use their PII for business purposes only, and not disclose their PII to unauthorized third parties. Had Plaintiffs and the Class known their PII would not be protected, they would not have allowed PowerSchool to possess it.

132. PowerSchool owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, using, maintaining, and protecting their PII from unauthorized third parties.

133. The legal duties owed by PowerSchool to Plaintiffs and the Class include, but are not limited to the following:

a. To exercise reasonable care in procuring, retaining, securing, safeguarding, deleting, and protecting the PII of Plaintiffs and the Class in PowerSchool's possession;

b. To protect the PII of Plaintiffs and the Class that was in PowerSchool's possession by using reasonable and adequate security procedures that are compliant with industry-standard practices; and

c. To implement processes and software to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiffs and Class of the Data Breach.

134. PowerSchool's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interested and enforced by the Federal Trade Commission, the unfair practices by companies like PowerSchool of failing to use reasonable measures to protect PII.

135. Various FTC publications and data security breach orders further form the basis of PowerSchool's duty. Plaintiffs and Class, by and through its educational institution, are consumers under the FTC Act. PowerSchool violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by not complying with industry standards.

136. PowerSchool breached its duties to Plaintiffs and the Class. PowerSchool knew or should have known the risks of collecting and storing PII and the importance of maintaining secure systems, especially in light of the fact that data breaches have recently been prevalent.

137. PowerSchool knew or should have known that its security practices did not adequately safeguard the PII of Plaintiffs and the Class.

138. Through PowerSchool's acts and omissions described in this Complaint, including PowerSchool's failure to provide adequate security measures and its failure to protect the PII of Plaintiffs and the Class from being foreseeably captured, accessed, exfiltrated, stolen, disclosed, and misused, PowerSchool unlawfully breached its duty to use reasonable care to adequately protect and secure the PII of Plaintiffs and the Class during the period it was within PowerSchool's possession and control.

139. PowerSchool's duty to use reasonable security measures arose as a result of the special relationship that existed between PowerSchool and Plaintiffs and the Class. That special relationship arose because PowerSchool was entrusted with Plaintiffs' and Class Members' confidential PII.

140. PowerSchool was subject to an "independent duty," untethered to any contract between PowerSchool and Plaintiffs and the Class.

141. PowerSchool's own conduct created a foreseeable risk of harm to an individual, including Plaintiffs and the Class. PowerSchool's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. PowerSchool's misconduct also included its decision not to comply with industry standards for safekeeping of the PII of Plaintiffs and the Class, including basic encryption techniques freely available to PowerSchool.

142. PowerSchool was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

143. PowerSchool had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and the Class.

144. PowerSchool breached the duties it owes to Plaintiffs and Class in several ways, including:

a. Failing to implement adequate security systems, protocols, and practices sufficient to protect customers' PII and thereby creating a foreseeable risk of harm;

b. Failing to comply with the minimum industry data security standards during the period of the Data Breach;

c. Failing to act despite knowing or having reason to know that its systems were vulnerable to attack; and

d. Failing to timely and accurately disclose to customers that their PII had been improperly acquired or accessed and was potentially available for sale to criminals on the dark web.

145. There is a close causal connection between PowerSchool's failure to implement security measures to protect the PII of Plaintiffs and Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was stolen and accessed as the proximate result of PowerSchool's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

146. Due to PowerSchool's misconduct, Plaintiffs and the Class are entitled to credit monitoring at a minimum. The PII taken in the Data Breach can be used for identity theft and other types of financial fraud against Plaintiffs and the Class.

147. Some experts recommend that data breach victims obtain credit monitoring services for at least ten years following a data breach.

148. As a result of PowerSchool's negligence, Plaintiffs and the Class suffered injuries that include:

i. the lost or diminished value of PII;

ii. out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

iii. lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, time spent

deleting phishing email messages and cancelling credit cards believed to be associated with the compromised account;

iv. the continued risk to their PII, which may remain for sale on the dark web and is in PowerSchool's possession and subject to further unauthorized disclosures so long as PowerSchool fails to undertake appropriate and adequate measures to protect the PII in their continued possession;

v. future costs in terms of time, effort, and money that will be expended to prevent, monitor, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and the Class, including ongoing credit monitoring.

149. These injuries were reasonably foreseeable given the history and uptick of data security breaches of this nature within the financial sector. The injury and harm that Plaintiffs and the Class suffered was the direct and proximate result of PowerSchool's negligent conduct.

## COUNT II
## Negligence *Per Se*

150. Plaintiffs and the Class reallege and incorporate all foregoing paragraphs.

151. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of PowerSchool's duty in this regard.

152. PowerSchool violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and comply with applicable industry standards. PowerSchool's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable harm.

153. PowerSchool's violations of Section 5 of the FTC Act constitute negligence *per se.*

154. Plaintiffs and the Class are within the class of persons that the FTCA is intended to protect.

155. The harm that occurred as a result of the Data Breach is the type of harm the FTCA is intended to guard against. The FTC has pursued enforcement actions against businesses, which, because of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

156. As a direct and proximate result of PowerSchool's negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) actual instances of identity theft or fraud; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud, identity theft; and/or other various forms of fraud (v) costs associated with placing or removing freezes on credit reports; (vi) the continued risk to their PII, which remains in PowerSchool's possession and is subject to further unauthorized disclosures so long as PowerSchool fails to undertake appropriate and adequate measures to protect the PII of its current and former customers in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class.

157. Additionally, as a direct and proximate result of PowerSchool's negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in PowerSchool's possession and is subject to further unauthorized disclosures so long as PowerSchool fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

158. As a direct and proximate result of PowerSchool's negligence *per se*, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

**COUNT III**
**Unjust Enrichment**

159. Plaintiffs and the Class reallege and incorporate all foregoing paragraphs.

160. This claim is brought in the alternative to Plaintiffs' breach of contact claims below.

161. Plaintiffs and the Class conferred a monetary benefit to Defendant by providing PowerSchool with their valuable PII, by permitting it access to their PII so that it could earn revenue by maintaining and utilizing Plaintiffs' and Class Members' PII, which PowerSchool knowingly used or retained in the course of its business.

162. PowerSchool benefited from receiving Plaintiffs' and the Class Members' PII by its ability to retain and use that information for its own financial business benefit. PowerSchool understood this benefit and accepted the benefit knowingly.

163. PowerSchool also understood and appreciated that the PII of Plaintiffs and the Class was private and confidential to them, and that its value depended upon PowerSchool maintaining the privacy and confidentiality of that PII.

164. Plaintiffs and the Class would not have permitted PowerSchool to have access to their PII without the implicit promise by PowerSchool to protect it. Plaintiffs and the Class gave up their privacy to PowerSchool in exchange for protecting it from others, and PowerSchool accepted this exchange because it would realize a financial benefit by providing services related to this PII.

165. Instead of providing a reasonable level of security that would have prevented the Data Breach, however, PowerSchool instead calculated to avoid their data security obligations at the expense of Plaintiffs and the Class by utilizing cheaper, ineffective security measures. Plaintiffs and the Class, on

the other hand, suffered a direct and proximate result of PowerSchool's failure to provide the requisite security.

166. But for PowerSchool's willingness and commitment to maintain privacy and confidentiality, that PII would not have been transferred to and entrusted with PowerSchool. Indeed, if PowerSchool had informed its customers that its data and cyber security measures were inadequate, PowerSchool would not have been permitted to continue to operate in that fashion.

167. As a result of PowerSchool's wrongful conduct, it has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and the Class. PowerSchool continues to benefit and profit from its retention and use of the PII while its value to Plaintiffs and the Class has been diminished.

168. PowerSchool's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged in this Complaint, including compiling, using, and retaining Plaintiffs' and the Class's PII, while at the same time failing to maintain that information securely from intrusion and theft by cyber criminals, hackers, and identity thieves.

169. Plaintiffs and the Class have no adequate remedy at law.

170. Under principals of equity and good conscience, PowerSchool should not be permitted to retain the benefits obtained from Plaintiffs and the Class because PowerSchool failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiffs and the Class were entitled to, and that were mandated by federal, state, and local laws and industry standards.

171. PowerSchool acquired a monetary benefit and PII through inequitable means, in that it failed to disclose the inadequate security practices previously alleged.

172. As a direct and proximate result of PowerSchool's conduct, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm. PowerSchool should be compelled

to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and the Class, proceeds that it unjustly received.

173. As a direct and proximate result of PowerSchool's above-described breach of implied contract, Plaintiffs and the Class have suffered, and will continue to suffer, ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identify theft crimes, fraud, and abuse resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic time that the Plaintiffs and Class have not been compensated for.

174. As a direct and proximate result of PowerSchool's conduct, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm.

## COUNT IV
## Breach of Third-Party Beneficiary Contract

175. Plaintiffs and the Class reallege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

176. PowerSchool entered into written contracts with school districts and educational institutions such as Crescent Academy International to perform cloud-based software services that included receiving access to the PII of Plaintiffs and the Class.

177. This contract was made in part for the benefit of Plaintiffs and the Class, as Plaintiffs and Class Members were the intended third-party beneficiaries of the contract entered into by PowerSchool. Indeed, PowerSchool knew that if it were to breach the implied contract with the educational institutions

and school districts, then Plaintiffs and Class Members would be harmed by, among other things, fraudulent misuse of their PII.

178. It was intended by PowerSchool at the time the contracts were made that PowerSchool would assume a direct obligation to protect Plaintiffs' and the Class's PII.

179. It was also intended by PowerSchool that the performance under the contract would necessarily and directly benefit Plaintiffs and the Class. PowerSchool would utilize the PII it collected in providing software services for Plaintiffs and the Class Members, on behalf of educational institutions and school districts.

180. PowerSchool breached its obligations under its implied contracts, to which Plaintiffs and the Class Members are intended beneficiaries, directly resulted in the Data Breach and the injuries that Plaintiffs and all Class Members have suffered.

181. As a direct and proximate result of PowerSchool's breach of implied contracts, Plaintiffs and all other Class Members suffered and will continue to suffer damages, because (i) they face a substantially increased risk of identity theft and financial fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) their PII was improperly disclosed to unauthorized individuals; (iii) the confidentiality of their PII has been breached; (iv) they were deprived of the value of their PII, for which there is a well- established national and international market; and (v) lost time and money incurred, and future costs required, to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

## COUNT V
## Breach of Fiduciary Duty

182. Plaintiffs and the Class reallege and incorporate all foregoing paragraphs.

183. The PII of Plaintiffs and the Class was provided to PowerSchool, by and through Plaintiffs' educational institution, in confidence, believing that PowerSchool would protect that information.

PowerSchool's acceptance and storage of Plaintiffs' and Class Members' PII created a fiduciary relationship between PowerSchool and Plaintiffs and Class Members.

184. In light of this relationship, PowerSchool had a fiduciary duty to act for the benefit of Plaintiffs and the Class upon matters within the scope of this relationship, which includes safeguarding and protecting the PII of Plaintiffs and the Class.

185. PowerSchool breached that duty by failing to properly protect the integrity of the system containing the PII of Plaintiffs and the Class and otherwise failing to safeguard the PII of Plaintiffs and the Class that it collected.

186. As a direct and proximate result of PowerSchool's breaches of their fiduciary duties, Plaintiffs and the Class have suffered and will continue to suffer injury, including, but not limited to (i) a substantially increased risk of identity theft and financial fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) the improper compromise, publication, and theft of their PII; (iii) deprivation of the value of their PII, for which there is a well-established national and international market; (iv) lost time and money incurred, and future costs required, to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (v) the continued risk to their PII which remains in PowerSchool's possession.

## COUNT VI
## Declaratory Judgment and Injunctive Relief

187. Plaintiffs and the Class reallege and incorporate all foregoing paragraphs.

188. Plaintiffs bring this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

189. Defendant owes a duty of care to Plaintiffs and the Class that requires it to adequately secure Plaintiffs' and the Class Members' PII.

190. Defendant failed to fulfill its duty of care to safeguard Plaintiffs' and the Class Members' PII.

191. Plaintiffs and the Class are at risk of harm due to the exposure of their PII and Defendant's failure to address the security failings that lead to such exposure.

192. Plaintiffs, therefore, seeks a declaration that (1) Defendant's existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect customers' personal information, and (2) to comply with their explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

e. Conducting regular database scanning and security checks;

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g. Purchasing credit monitoring services for Plaintiffs and the Class for a period of ten years; and

h. Meaningfully educating Plaintiffs and the Class about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request judgment against Defendant and that the Court grant the following:

1. For an order certifying the Class and appointing Plaintiffs and their counsel to represent the Class;

2. For an order enjoining Defendant from engaging in the wrongful conduct alleged herein concerning disclosure and inadequate protection of the PII belonging to Plaintiffs and the Class;

3. For injunctive relief requiring Defendant to:

a. Engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Engage third-party security auditors and internal personnel to run automated security monitoring;

c. Audit, test, and train its security personnel regarding any new or modified procedures;

d. Segment their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

e. Conduct regular database scanning and security checks;

f. Routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g. Purchase credit monitoring services for Plaintiffs and the Class for a period of ten years; and

h. Meaningfully educate Plaintiffs and the Class about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

4. An order instructing Defendant to purchase or provide funds for credit monitoring services for Plaintiffs and all Class Members;

5. An award of compensatory, statutory, nominal and punitive damages, in an amount to be determined at trial;

6. An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

7. An award of reasonable attorney's fees, costs, and litigation expenses, as allowable by law; and

8. Any and all such other and further relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand this matter be tried before a jury.

Respectfully submitted,

Dated: January 14, 2025

*/s/ John J. Nelson*

John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Tel: (858) 209-6941
jnelson@milberg.com

E. Powell Miller*
Emily E. Hughes*
**THE MILLER LAW FIRM, P.C.**
950 West University Drive
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com
eeh@millerlawpc.com

Kassem Dakhlallah*
**Hammoud, Dakhlallah & Associates PLLC**
6050 Greenfield, Ste 201
Dearborn, MI 48126
Tel: (313) 551-3038
kd@hdalawgroup.com

**Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiffs and the Putative Class*